NOT DESIGNATED FOR PUBLICATION

No. 118,857

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of J.H.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Shawnee District Court; STEVEN R. EBBERTS, judge. Opinion filed September 14, 2018. Affirmed.

*Wayne French*, of Topeka, for appellant natural mother.

*Michael F. Kagay*, district attorney, and *Morgan L. Hall*, deputy district attorney, for appellee.

Before STANDRIDGE, P.J., BRUNS and GARDNER, JJ.

PER CURIAM:  Mother, the natural mother of J.H., appeals the termination of her parental rights. She argues that the district court erred in finding that she was unfit. Finding no error, we affirm.

*Factual and Procedural Background*

Mother is the natural mother of J.H., born in 2012. In January 2013, the State filed a petition alleging J.H. was a child in need of care under K.S.A. 2012 Supp. 38-2202(d)(1), (d)(2), and (d)(3). Following the State's petition, the court placed J.H. in the temporary custody of the Kansas Department for Children and Families (DCF). On May 7, 2013, J.H was adjudicated a child in need of care, and both parents were found to be in default for failure to appear. At the June 3, 2013, disposition hearing, the district court

1

ordered J.H. to remain in custody of the Secretary, and adopted the proposed permanency plan with the goal of reintegration.

After finding that the State made reasonable efforts toward reintegration for over two years, the district court changed the case plan goal to a dual goal of reintegration and adoption in October 2015. Nearly a year later, in September 2016, the district court found that despite reasonable efforts reintegration was no longer a viable goal, so it changed the permanency plan to the sole goal of adoption. The State filed a motion to terminate parental rights.

During the termination hearing, the following evidence was presented. J.H. was born at 29 weeks, and as a premature baby had various complications needing medical attention. J.H. struggled to put on weight and failed to thrive. Donna Schlink, a social worker with DCF, conducted an investigation regarding J.H. after receiving a report that Mother self-reported methamphetamine use by both parents. At the time, Mother and J.H. lived with Grandmother. Schlink discovered that J.H. was not receiving his medications. J.H. was supposed to be on a heart monitor, but J.H.'s father had taken it off because he found it unnecessary and because "it was beeping all the time and it was driving him crazy." At that time, Mother tested positive for amphetamines in her urinalysis (UA). Following a second report, DCF found that allegations of physical and medical neglect were substantiated.

Since J.H. was removed from the home in 2013, Mother's goal has been reintegration, but she has been unsuccessful for various reasons. Mother's biggest barrier to reintegration is her drug abuse and addiction. Mother began using methamphetamine at 17 years old. Since the case began, Mother has attended inpatient treatment four times and outpatient treatment two times. She was discharged from several treatment facilities before she began working with Sara Weber, an addiction counselor with Sims Kemper Clinical Counseling, in 2016. While working with Weber, Mother had trouble being

2

successful in her treatment. When Mother is clean, she is a good participant in her addiction treatment. But when Mother is not clean and sober, she is not amenable to treatment; she is easily agitated and shows outward signs of drug abuse, such as coming to treatment unclean and unkempt and picking at her skin and hair. Her attendance at treatment is sporadic during those times.

Mother was not always willing to attend treatment, whether inpatient or outpatient, and Mother did not follow the recommendations of several RADAC assessments. After one relapse, a case worker had Mother complete another RADAC assessment, the results of which recommended outpatient treatment. RADAC set up an intake for Mother at Valeo Behavioral Health, but she did not want to go because "someone connected with [J.H.'s] father" attended that treatment program. At that point Mother said she just was not willing to go to treatment and she did not feel it was needed and she did not want to do it. At one point, Mother was accepted to Oxford House, but Mother claimed they never called her back. At the time of the hearing, Mother was attending inpatient treatment at Mirror. After she completes treatment, Weber thought that Mother would likely be more successful at an outpatient facility other than Sims Kemper to get "a fresh start."

In addition to her struggles with inpatient and outpatient treatment, Mother was not compliant in her required drug testing and UA submissions. Although Mother went through periods of time when she produced clean UAs, she also skipped UAs, refused to give samples, and tested positive to many of her UAs and hair tests. Obtaining UAs from Mother was often difficult and sometimes resulted in verbal confrontations. Sometimes when she tested positive, Mother and Grandmother disputed the results.

Mother's inability to stay clean affects her time with J.H. Mother's case workers wanted to see seven months of sobriety before reintegration, but Mother's longest period of sobriety was less than 60 days. At times, Mother would go through periods of almost a

month of sobriety, gaining more time with J.H. and gaining overnight visits with him multiple nights per week. But then Mother would relapse and get less time with J.H. Angela McKeever, a KVC case manager, described Mother's pattern of sobriety as "consistent relapse, back to treatment, sober for a while, relapse, back to treatment."

Mother knew that her continued drug use was her biggest barrier to reintegration, as it directly affected her ability to provide stability for J.H. Tracey Winters, a social worker with KVC, believed that because Mother had familial support, if Mother could stay clean, she would be successful in her other goals—obtaining her GED, finding and keeping a job, and succeeding long-term. But Mother has not been able to do so. When the court changed the permanency goal to a dual goal of reintegration and adoption, McKeever explained to Mother that the court's decision directly resulted from Mother's inability to achieve and maintain sobriety. McKeever hoped that conversation would help Mother understand the importance of gaining and maintaining her sobriety in order to achieve reintegration.

Other than her drug use, other aspects of Mother's life are unstable and pose additional barriers to reintegration. Mother has no steady job or income. She had several part-time jobs at times, but since 2014 the longest that Mother held a job was three or four months. Because she lacks a stable income, she cannot provide food, housing, and stability for J.H. Mother lived with Grandmother for most of the case and lived with friends or attended inpatient treatment for short amounts of time. Although Grandmother's house is stable, case workers expressed concerns that Grandmother enables Mother so they are hesitant about J.H. living there.

Throughout the case, agencies provided resources and services to help Mother with her parenting skills. Jennifer Gassmann, a social worker and drug endangered child specialist with the Kansas Children Service League, began working with Mother when she was pregnant with J.H. in August 2012 until January 2013, when J.H. was placed in

4

State custody. During that time, Gassmann met with Mother weekly, conducted home visits, and provided parenting education and support. Mother was consistent with her participation at first, even enrolling in an outside parenting class, but became less consistent when she relapsed in December 2012. To help refine Mother's parenting skills, McKeever asked Mother to complete a chart of parental duties, such as feeding J.H., changing his diaper, and bathing him. Mother never completed the chart, though, and McKeever found out that Grandmother was the one completing the parenting duties.

Mother also had several outlets of general support. KVC employees conducted monthly visits with Mother and encouraged her to reach out if she needed anything. KVC offered to provide bus passes and gas cards. KVC was in contact with other community partners that Mother was involved with, including Valeo, Mirror, and Sims Kemper, to coordinate services. Mother received drug and alcohol treatment in the community, and received mental health assistance through Valeo.

Agencies also offered Mother help with her personal growth and development, but Mother did not make much of an effort to better herself. McKeever offered individual therapy with Mother, but Mother was not interested. Crystal White, a previous counselor and case manager with KVC, counseled Mother by discussing her triggers and encouraged her to engage in healthy social activities. White also tried to help Mother focus on her ability to care for herself, including meeting her basic needs of food, clothing, shelter, and hygiene. For example, in some of their monthly meetings, White helped Mother set goals for brushing her teeth and going to the dentist. Despite the various forms of outreach, White was not confident that Mother could care for J.H.'s basic needs. She was also concerned about Mother's ability to attend J.H.'s medical appointments because of her continued drug use.

J.H. has lived with Uncle since February 2013. Uncle treats J.H. as part of the family and as his own son. J.H. plays tee ball and participates in family events, such as

5

Fourth of July picnics, birthday dinners, and other holiday events. Uncle is aware of J.H.'s residual medical affects and takes steps to address them. While in Uncle's care, Grandmother (who is also Uncle's mother) spends time with J.H. as well. She does not have official visits with J.H., but interacts with him often. She sometimes drops him off at school, attends his tee ball games, and goes to some of his medical appointments. She also sometimes babysits when Uncle needs someone to watch J.H.

Although Uncle does not believe Mother can properly care for J.H. right now, if Mother were in an appropriate state to spend time with J.H. and to be in his life, he would support that. Uncle has no hesitation that he would like to adopt J.H., and has considered him his son from the day he was born.

The State's witnesses did not question whether Mother loves J.H. or wants him back. At the same time, though, they believed that adoption is in J.H.'s best interest, especially considering J.H.'s young age, how long he has been out of Mother's care, and Mother's lack of progress in addressing her addiction.

Mother testified that she would like to get a job and go back to school. She testified that she had been employed at a number of places, and had held a job for "at least four months." At the time of the termination hearing, she expected a job offer from Reser's Fine Foods or had already received a conditional offer of employment. She had "done inpatient" treatment three or four times for 30 days at a time, as well as outpatient treatment. She was in inpatient treatment at Mirror and believed her outcome would be better than in the past because she had a better attitude and planned to participate in the aftercare program to help her reintegrate into the community. Mother was on medication management through Valeo, but was not in any therapy or counseling.

After hearing all the testimony, the court found that Mother was an unfit parent and terminated Mother's parental rights based on the following statutory sections: K.S.A. 2017 Supp. 38-2269(b)(3); (b)(7); (b)(8); and (c)(3). The court also found that Mother's conduct is unlikely to change in the foreseeable future, and that it is in J.H.'s best interest that Mother's parental rights be terminated. Mother appeals, arguing that the trial court erred in finding her unfit.

*Governing Legal Principles*

We begin with some general principles governing proceedings under the Revised Kansas Code for Care of Children, K.S.A. 2017 Supp. 38-2201 *et seq.* A parent has a constitutionally protected liberty interest in the relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 759-60, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Given the inherent importance and unique character of that relationship, the right has been deemed fundamental. Accordingly, the State may extinguish the legal bonds between parent and child only upon clear and convincing proof of parental unfitness. K.S.A. 2017 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

As provided in K.S.A. 2017 Supp. 38-2269(a), the State must prove the parent to be unfit "by reason of conduct or condition" making him or her "unable to care properly for a child" and that the circumstances are "unlikely to change in the foreseeable future." The statute contains a nonexclusive list of nine conditions that singularly or in combination would amount to unfitness. K.S.A. 2017 Supp. 38-2269(b). And the statute lists four other factors to be considered if a parent no longer has physical custody of a child. K.S.A. 2017 Supp. 38-2269(c). The State may also rely on 1 or more of 13 statutory presumptions of unfitness outlined in K.S.A. 2017 Supp. 38-2271.

7

In reviewing a district court's determination of unfitness, an appellate court must be convinced, based on the full evidentiary record considered in a light favoring the State as the prevailing party, that a rational factfinder could have found that decision "highly probable, *i.e.*, [supported] by clear and convincing evidence." *In re B.D.-Y.*, 286 Kan. at 705. The appellate court cannot weigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. 286 Kan. at 705. In short, any conflicts in evidence must be resolved to the State's benefit.

Having found unfitness, the district court must then determine whether termination of parental rights is "in the best interests of the child." K.S.A. 2017 Supp. 38-2269(g). The district court makes that determination based on a preponderance of the evidence. *In re R.S.*, 50 Kan. App. 2d at 1116. The best-interests issue is essentially entrusted to the district court acting within its sound judicial discretion. 50 Kan. App. 2d at 1115-16. An appellate court reviews those sorts of decisions for abuse of discretion. A district court exceeds that broad latitude if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

*Mother is unfit to adequately care for J.H.*

We first address the district court's finding that Mother's use of dangerous drugs was such duration or nature as to render her unable to care for J.H.'s ongoing physical, mental, or emotional needs of the child. See K.S.A. 2017 Supp. 38-2269(b)(3). We find clear and convincing evidence supporting the district court's finding that Mother was unfit.

8

Mother's drug use was the primary reason for J.H.'s removal from the home and remains the biggest barrier to reintegration. She does not follow recommendations from treatment centers, and she has been unsuccessful in achieving sobriety. Case workers wanted Mother to remain clean and sober for seven months before considering reintegration, but Mother has shown that she cannot stay sober for longer than one or two months. Mother's history of relapsing, her inability to successfully complete treatment, and her lack of effort to change her behavior render her unable to care for J.H.'s physical, mental, and emotional needs. See K.S.A. 2017 Supp. 38-2269(b)(3).

Second, efforts made by involved public and private agencies to rehabilitate the family have been unsuccessful. See K.S.A. 2017 Supp. 38-2269(b)(7). Case workers and local agencies made repeated and reasonable efforts, but those efforts failed to get Mother to a place where she could be more involved in J.H.'s life. Mother was offered several resources for counseling, parenting help, bus passes and gas cards, and support from many different agencies. They helped enroll Mother in various treatment facilities and maintained contact to provide coordinated care. Despite these efforts, Mother did not consistently participate in drug abuse treatment or counseling. Treatment centers gave Mother recommendations and support for her methamphetamine addiction, but Mother continues the relapsing cycle and has been released from several addiction rehabilitation facilities because of her continued violations of their policies.

Third, Mother has displayed a lack of effort to adjust her circumstances, conduct, and conditions. See K.S.A. 2017 Supp. 38-2269(b)(8). She was largely uncompliant with drug screens and UAs, refused to follow treatment recommendations, and failed to provide case workers with documentation of the steps she had taken to better herself. She lives with her mother, has no job, and case workers question her ability to care for herself. Her instability is largely because of a lack of effort, and she has provided little—if any—indication that she is working to change her circumstances or better herself.

9

Mother does not always take responsibility for her lack of progress on her case plan tasks or her pursuit to achieve a clean and sober life. Mother disputed her involvement with drugs, blamed others, and protested positive drug screen results. She felt as if structured treatment facilities were not the right fit for her. Mother has displayed a lack of effort during this case.

Fourth, Mother failed to carry out a reasonable, court-approved plan to reintegrate J.H. into her home. See K.S.A. 2017 Supp. 38-2269(c)(3). She was not fully compliant with drug screens and UA tests. Mother has no stable, full-time job. She did not show that she completed case tasks, and she signed only a limited release of information for her case workers. Despite ample time in which to accomplish the reasonable tasks established by the court, Mother has not done so.

These factors, individually and collectively, show Mother is unfit.

*Mother's conduct is unlikely to change in the foreseeable future.*

We next review the district court's decision that Mother's conduct is unlikely to change in the foreseeable future. See K.S.A. 2017 Supp. 38-2269(a). We view the foreseeable future from "the child's perspective, not the parents', as time perception of a child differs from that of an adult." *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008). Mother's past conduct may be used as an indicator of her future behavior. See *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982).

> "A parent may be labeled 'unfit' under the law even though he or she loves the child and wants to do the right thing, which may be the case here. But we must judge these cases based mostly upon actions, not intentions, and we must keep in mind that a child deserves to have some final resolution within a time frame that is appropriate from that child's sense of time." *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008).

10

Nothing in the record suggests that Mother's conduct is likely to change. Unfortunately, Mother has struggled with methamphetamine abuse since she was a teenager. She has shown little to no progress during the four years this case has gone on. After four years of treatment attempts and local support and outreach, Mother still has no stable income or employment and significantly struggles with drug addiction. She made "very minimal" progress with her permanency plan. The district court properly found that Mother's conduct is unlikely to change in the foreseeable future.

*Termination of Mother's parental rights is in J.H.'s best interests.*

Finally, a district court must determine whether termination of parental rights is in the best interests of the child. K.S.A. 2017 Supp. 38-2269(g)(1). The district court is in the best position to make findings on the best interests of the child, and we will not disturb its judgment unless we find the determination amounts to an abuse of judicial discretion. *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255 (2010). When considering whether termination of parental rights is in the best interests of the child, the court will consider the physical, mental, and emotional health of the child. K.S.A. 2017 Supp. 38-2269(g)(1). A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) is based on an error of law; or (3) is based on an error of fact. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015).

We agree that J.H.'s best interests would be served by termination of Mother's parental rights. Because of her drug abuse and addiction, lack of income and employment, and general instability, Mother cannot adequately provide for J.H.'s physical, mental, and emotional needs. J.H. is a young boy who has been in State's custody for nearly his entire life—he was removed from Mother's care when he was just four months old and was placed with his uncle, who stands ready to adopt him. Further, J.H. has lingering medical needs that Mother cannot fully and consistently address. J.H.

11

deserves permanency with someone who treats him as a permanent family member and who can address all of his physical, mental, and emotional needs.

The State has shown by clear and convincing evidence that Mother is unfit, that Mother's circumstances are unlikely to change in the foreseeable future, and that it is in J.H.'s best interests that we terminate Mother's parental rights.

Affirmed.